*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* DL.

STACY BATZER,

Petitioner-Appellee,

v

DL,

Respondent-Appellant.

UNPUBLISHED
July 20, 2026
2:52 PM

No. 376791
Washtenaw Probate Court
LC No. 20-000875-MI

Before: M. J. KELLY, P.J., and PATEL and KOROBKIN, JJ.

PER CURIAM.

In this civil-commitment action under the Mental Health Code, MCL 330.1001 *et seq*., respondent, DL, appeals as of right the trial court order continuing involuntary mental-health treatment for DL following an evidentiary hearing on the petition. We affirm.

## I. FACTS AND PROCEEDINGS

Respondent, DL, is diagnosed with schizophrenia. He has been subject to court-ordered involuntary mental-health treatment since he was found incompetent to stand trial on charges of trespass and assaulting, resisting, or obstructing a police officer in 2020 on the Ann Arbor campus of the University of Michigan (U of M). Following years of hospitalization, in February 2025, respondent was discharged to live at a specialized residential facility run by Turning Leaf Behavioral Health. In July 2025, petitioner filed a petition to continue respondent's involuntary mental-health treatment, and, following an evidentiary hearing, the trial court ruled that respondent was a person requiring treatment under MCL 330.1401(1)(c). This appeal followed.

## II. FACTUAL FINDINGS AND DISPOSITION

Respondent argues that the trial court erred by ordering him to continue involuntary mental-health treatment because petitioner failed to present clear and convincing evidence to show that respondent was a person who needed treatment under the Mental Health Code. We disagree.

-1-

## A. STANDARDS OF REVIEW AND LEGAL PRINCIPLES

We review a probate court's dispositional rulings for abuse of discretion. *In re MAT*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 369255); slip op at 2. "An abuse of discretion occurs when the probate court chooses an outcome outside the range of reasonable and principled outcomes." *In re Portus*, 325 Mich App 374, 381; 926 NW2d 33 (2018) (cleaned up). When a probate court makes an error of law, it necessarily abuses its discretion. *Id*. We review the factual findings underlying a probate court's decision for clear error. *Id*. "A probate court's finding is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." *Id*. (cleaned up). Finally, we review issues of statutory interpretation de novo. *Id*.

A proceeding seeking an order of involuntary mental-health treatment is generally referred to as a civil-commitment proceeding. *In re Jestila*, 345 Mich App 353, 356; 5 NW3d 362 (2023). "The Michigan Supreme Court has held that civil commitment statutes must be strictly complied with." *Id*. at 358.

In a civil-commitment proceeding, "involuntary mental health treatment" means "court-ordered hospitalization, assisted outpatient treatment, or combined hospitalization and assisted outpatient treatment as described in [MCL 33.1468]." MCL 330.1400(f). A probate court may properly order a respondent to undergo involuntary mental-health treatment when it finds by clear and convincing evidence that the respondent was a "person requiring treatment" under MCL 330.1401. *In re Londowski*, 340 Mich App 495, 504-505; 986 NW2d 659 (2022), citing MCL 330.1400(f), MCL 330.1468(2), and MCL 330.1465. When a person who is the subject of a petition objects to involuntary mental-health treatment, the fact-finder must determine whether the petitioner established, by clear and convincing evidence, MCL 330.1465, that the respondent was a "person requiring treatment" under MCL 330.1401(1), which means one of the following:

> (a) An individual who has mental illness, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself, herself, or another individual, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.

> (b) An individual who has mental illness, and who as a result of that mental illness is unable to attend to those of his or her basic physical needs such as food, clothing, or shelter that must be attended to in order for the individual to avoid serious harm in the near future, and who has demonstrated that inability by failing to attend to those basic physical needs.

> (c) An individual who has mental illness, whose judgment is so impaired by that mental illness, and whose lack of understanding of the need for treatment has caused him or her to demonstrate an unwillingness to voluntarily participate in or adhere to treatment that is necessary, on the basis of competent clinical opinion, to prevent a relapse or harmful deterioration of his or her condition, and presents a substantial risk of significant physical or mental harm to the individual or others.

" 'Mental illness' means a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." MCL 330.1400(g).

## B. DISCUSSION

Petitioner presented clear and convincing evidence that DL was a person requiring treatment under MCL 330.1401(1). Dr. Daniel Healy testified that DL had a mental illness—schizophrenia—which he described as "a substantial disorder of thought" and which also impaired DL's judgment. Dr. Healy explained that DL's mental illness caused him to experience grandiose and paranoid delusions including that he owned U of M, that satanic murders were occurring on campus, and that he was poisoned while in jail on charges stemming from his trespass and arrest at U of M. Dr. Healy and Turning Leaf employee, Spencer Hickey, testified that DL denied the need for mental-health treatment. Evidence also showed that DL lost 40 pounds when he refused to eat because he thought that the food in the Washtenaw County Jail was poisoned by the judge in his criminal case. Hickey further testified that, even after his antipsychotic medication was regulated, DL placed himself at risk of harm by trying to walk 10 miles on busy roads in the rain and hitchhiking to a Secretary of State office because he falsely believed that Turning Leaf was preventing him from obtaining photo identification.

DL maintains that the trial court's findings of fact were clearly erroneous because the trial court found Dr. Healy's testimony more credible than respondent's written submissions simply because Dr. Healy was a medical professional. Nothing in the record indicates that the trial court stated or implied that Dr. Healy's testimony was more credible than DL's written statements merely because of Dr. Healy's credentials as an expert in psychiatry. But it was for the trial court as the finder of fact to determine whether it believed Dr. Healy's testimony about DL's mental illness or DL's denial that he suffers from any mental illness. See *In re Portus*, 325 Mich App at 397. DL cites no legal authority to support his claim that the trial court should have found his written statements more persuasive. We "defer to the trial court on issues of credibility." *In re MAT*, ___ Mich App at___; slip op at 8 (cleaned up). This Court affords the same deference to the trial court's findings of fact because of its "unique vantage point regarding witnesses, their testimony, and other influencing factors not readily available to the reviewing court." *In re Portus*, 325 Mich App at 397 (cleaned up).

DL also challenges the testimony as unreliable and contrary to the evidence that he submitted to the trial court. As petitioner argues, DL attempts to show that Dr. Healy's and Hickey's testimonies were false by relying on documents that he drafted himself that contain his own bald assertions. DL has not shown that any statements that Dr. Healy and Hickey made at trial were unreliable or inaccurate on the basis of those assertions. DL takes issue with nearly two dozen remarks Dr. Healy made during his testimony, many of which were statements that DL suffered from a mental illness and experienced delusions. As one example, DL argues that he did not have "episodes" of grandiose delusions because there was no evidence of "plural episodes." But Dr. Healy explained that DL repeatedly stated a sincere belief that he owned U of M and that he expressed that belief over a long period. DL asserts that he made clear that he did not express the (presumably delusional) belief that he was in "possession" of U of M, only that he was awarded U of M in a federal case in 2014. But DL's assertion is a distinction without a difference because U of M is a public university that is owned by the state of Michigan and governed by a Board of

Regents, and a federal court could not "award" DL an ownership interest in U of M as he claims. See Const 1963, art 8, §§ 4-5.

DL also argues that he "always said" that he could not be a trespasser at U of M because he was a graduate of the school. But even assuming that DL attended U of M, nothing in the record showed that DL ever questioned his arrest on the ground that he had a legal right to be there as an alumnus. Moreover, DL's bare assertion that he attended U of M does not dictate that he, or any of the hundreds of thousands of other former U of M students, was legally allowed to be inside any building on campus at any time of day. As Dr. Healy testified, DL was in a campus library trying to prevent satanic murders at U of M during one of his confrontations with police. DL has not shown that, as a former student, he was allowed to be in a campus library at that time. Further, his position is also contradicted by his repeated claims that he was not trespassing because he was awarded U of M in a federal court case in 2014. Considering DL's various assertions about U of M alone, Dr. Healy was not incorrect that DL had delusional "episodes."

DL argues that he made assertions about satanic murders long before he was arrested for trespassing in 2020 and long before his mental-health hearing in July 2025. But, as discussed, Dr. Healy's testimony instead suggested that DL expressed that delusion when he was arrested for trespassing at U of M in 2020, and, at the time of the hearing, no evidence contradicted that testimony. Even if DL could show that he made a statement about satanic murders on some other occasion, Dr. Healy's testimony established that, particularly when he was not on antipsychotic medications, DL's serious mental illness caused him to have delusions that led him to engage in criminal conduct and placed himself and others at risk of harm.

DL takes the position that law enforcement, psychiatrists, and the district and circuit courts acted in concert to imprison him through mental-health commitments when he suffers from no mental-health condition. According to DL, he should not be committed to involuntary mental-health treatment simply because he refuses to admit that he suffers from schizophrenia because a person who does not suffer from a mental-health condition should not be expected to make such an admission. But, as discussed, ample other evidence supported the conclusion that DL had schizophrenia and that he was a person requiring involuntary mental-health treatment.

DL claims that Dr. Healy's reliance on his medical records resulted in errors in his testimony because Dr. Healy did not review DL's statements correcting mistakes in his medical record. DL's medical records were not admitted at the hearing and have not been filed with this Court on appeal. But DL filed his statements correcting errors in his medical records and most of his corrections relate to services that he claims he did not receive while at Walter P. Reuther (WPR) Hospital and repeated denials that he suffered from delusions, hallucinations, or any other symptoms of mental illness. As Dr. Healy testified, in addition to reviewing DL's mental-health records, he also conducted an interview with DL and consulted with DL's treating doctors before he testified at the hearing. For that reason, even assuming some of DL's corrections to his medical record were warranted, they did not establish that Dr. Healy's testimony was false.

DL further claims that no evidence showed that he posed a substantial risk of significant physical or mental harm to himself or others. He maintains that he was attacked by police officers at U of M, and he did not assault, obstruct, or resist arrest. He also argues that he had no history of aggressive conduct and that all charges against him were dropped. Records from the 15th

District Court in Ann Arbor reflect that DL was arraigned on felony charges for trespass and assault, resisting, or obstructing a police officer on February 4, 2020. The charges were dismissed by *nolle prosequi* following DL's competency hearing at which it is undisputed that he was found incompetent to stand trial. For those reasons, DL's assertions that he had no history of criminal or aggressive conduct is not persuasive.

DL further maintains that, since the incidents at U of M, he has not shown any aggressive or dangerous behavior. Evidence showed that DL lost 40 pounds when he was in jail because he believed that the food contained poison. Although the incidents at U of M and his subsequent arrest occurred before the hearing in this case, they showed that that there was a substantial risk that DL would harm himself or others when he did not have court-ordered mental-health treatment. DL also fails to recognize that, as Hickey testified, DL placed himself at significant risk of harm when he left Turning Leaf alone and tried to walk 10 miles in the rain along busy roads to get to the Secretary of State office. He placed himself at further risk of harm by hitchhiking part of the way. Although DL takes issue with Hickey's testimony because he argues that she did not have medical credentials, petitioner did not offer Hickey as an expert witness. Rather, Hickey worked as a case manager at Turning Leaf and also worked directly with DL. For those reasons, Hickey was in a position to testify about facts and her observations of DL while he lived there. DL maintains that Hickey's testimony was "false" because he maintains that Turning Leaf deliberately made him wait to get his photo identification. But, at the time of the hearing, Hickey's testimony was the only evidence presented on that issue and nothing DL asserts on appeal contradicts her description about DL's conduct.

DL minimally challenges evidence that he would stop taking his medication unless he was under a court order to do so and merely asserts that he has taken his medication while living at the Turning Leaf facility. But DL was required to take his medication under the supervision of staff at Turning Leaf. Dr. Healy testified that DL told other psychiatrists that he would not take any medication unless he was under a court order to do so and Hickey testified that DL told her that he did not believe that he needed to take any medication. Considering DL's repeated assertions that he does not suffer from any mental-health condition and that he does not need to take any medication, ample evidence established that DL lacked an understanding of the need for treatment and showed an unwillingness to voluntarily adhere to necessary treatment. See MCL 440.1401(1)(c).

DL makes the unsupported argument that Dr. Healy's testimony was influenced by an inclination to make money for Washtenaw County. Notwithstanding DL's bald assertion, no evidence showed that Washtenaw County had a special contract with Turning Leaf, that DL was only sent there to make money for the county, or that Dr. Healy's testimony was influenced by that alleged arrangement. DL further argues that Dr. Healy incorrectly testified that Turning Leaf was the least restrictive means to care for DL's mental-health condition and his activities of daily living.

Dr. Healy's testimony was supported by DL's repeated assertions that he did not suffer from schizophrenia and that he would not take any medication unless ordered to do so. As set forth in *In re DL*, unpublished per curiam opinion of the Court of Appeals, issued December 8, 2025 (Docket No. 374095), p 4, for a significant period before he agreed to be discharged to Turning Leaf, DL refused to be released to a group home setting and remained at WPR Hospital

because he wanted to be released to a homeless shelter without any ongoing supports or treatment. After spending years in hospital settings, DL was able to live in a less-restrictive environment at Turning Leaf that allowed him much greater autonomy, including working in the community. However, as Dr. Healy observed, it would be unsound to transfer DL to a different or less-restrictive living situation when he was only at Turning Leaf for about five months at the time of the hearing. While DL's care team may deem a change appropriate in the future, that was not the case as of the date of the hearing.

Contrary to DL's arguments on appeal, the exhibits admitted on his behalf at the hearing did not rebut the testimony presented by petitioner and did not weigh against the trial court's findings of fact. DL made various assertions that there was a complex conspiracy to arrest and commit him. The documents supported petitioner's view that DL required ongoing involuntary treatment because they showed that he had lasting delusional beliefs about the reasons for his arrest and commitment, and a continuing denial of any mental illness for which he needed treatment. Further, the trial court did not clearly err by concluding that DL's bald assertions and denials alone were insufficient to overcome the evidence presented by petitioner. Even accepting as true that DL may have noted some legitimate errors in his medical record, DL's corrections did not establish that he was misdiagnosed, that he did not need mental-health treatment, or that there was no risk of serious harm if he did not receive involuntary treatment.

DL maintains that he scored 30 out of 30 available points on the Montreal Cognitive Assessment (MoCA), which is used to detect mild cognitive impairment by assessing a person's memory, visuospatial abilities, executive functions, attention, concentration, language, and orientation to time and place.[1] A psychologist, Aiden Zamzow, conducted DL's MoCA and concluded that DL had normal cognitive function and was unlikely to have cognitive difficulties with activities of daily living and working at a job. But it was not petitioner's position that DL suffered from an intellectual disability. The MoCA did not measure DL's mental illness or whether he experienced delusions and therefore did not rebut evidence of his diagnosis of schizophrenia or his need for antipsychotic medication.

In sum, it was within the trial court's authority to determine the credibility of the witnesses and to assess the veracity and weight of DL's statements in his exhibits. See *In re Portus*, 325 Mich App at 397. The trial court did not clearly err by finding that DL was a person with schizophrenia, that the illness impaired his judgment, that he did not understand his need for treatment, that he did not voluntarily engage in treatment to prevent a relapse or deterioration of his illness, and that failing to continue his treatment created a substantial risk of significant physical or mental harm to himself or others. See *id*. at 381. Although DL takes issue with some testimony and denies that he suffers from any mental-health condition, the record does not disclose that the trial court made a mistake by finding that the evidence clearly satisfied MCL 330.1401(1)(c) and it did not abuse its discretion by ordering DL to continue involuntary mental-health treatment. See *id*.

---

[1] See MoCA Cognition, *MoCA Test* <https://mocacognition.com/the-moca-test/> (accessed June 25, 2026).

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

DL contends that his counsel's deficient performance denied him his right to the effective assistance of counsel. We disagee.

### A. STANDARDS OF REVIEW AND LEGAL PRINCIPLES

"The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *In re Londowski*, 340 Mich App 495, 516; 986 NW2d 659 (2022) (cleaned up). Because DL failed to request an evidentiary hearing, our review is limited to errors apparent on the record. *Id*.

Although proceedings for involuntary mental-health treatment are civil proceedings, they differ from most civil proceedings because "they carry the potential for curtailing an individual's liberty for a period of hospitalization . . . ." *In re Londowski*, 340 Mich App at 510. But, unlike a criminal prosecution, " '[i]n a civil commitment state power is not exercised in a punitive sense.' " *Id*., quoting *Addington v Texas*, 441 US 418, 428; 99 S Ct 1804; 60 L Ed 2d 323 (1979). "Instead, the intended outcome of these proceedings is to provide appropriate treatment if the individual is found to require it." *In re Londowski*, 340 Mich App at 510, citing MCL 330.1468(2); MCL 330.1401; MCL 330.1465. A respondent who is the subject of a civil commitment petition has the right to the effective assistance of counsel. *In re Londowski*, 340 Mich App at 515. This Court explained:

> In evaluating a claimed denial of the right to effective assistance of counsel in the civil commitment context, we adopt the familiar and well-established test that has developed in the criminal context, as we have done in the context of other civil proceedings. Accordingly, the benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the process that it cannot be relied on to have produced a just result. First, the respondent must show that counsel's performance was deficient under an objective standard of reasonableness. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by due process. Second, the respondent must show prejudice by demonstrating that counsel's errors were so serious as to deprive the [respondent] of a fair [hearing] . . . whose result is reliable. [*Id*. (cleaned up; alterations in original).]

As in other types of cases, this Court may remand a case to the trial court for an evidentiary hearing on a respondent's claims if necessary to facilitate appellate review. *Id*. at 516.

DL argues that his counsel was ineffective for failing to use his exhibits at the hearing to rebut Dr. Healy's testimony. Decisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy. *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). This Court will not "second-guess counsel on matters of trial strategy," nor will it "assess counsel's competence with the benefit of hindsight." *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012).

As discussed, DL's exhibits consisted primarily of bare assertions that he did not suffer from any mental illness, that he did not trespass at U of M, that he did not experience delusions, that he never acted aggressively, and that various government employees conspired to commit him. For the reasons stated, DL's written statements served as additional support for the trial court's finding that DL was a person requiring mental-health treatment because they showed his ongoing grandiose and paranoid delusions. DL asked his counsel to submit the statements to the trial court for its consideration and counsel did so, but DL now asserts that counsel should have used the statements to challenge Dr. Healy's testimony.

DL's counsel's decision not to use the exhibits for cross-examination was a matter of trial strategy that we will not second-guess on appeal. See *id*. at 716. We also decline to grant DL's request for relief because he fails to provide any explanation of what evidence his counsel should have cited at the hearing. Although we liberally construe a pro se party's pleadings, a party is nonetheless required to provide adequate support for his claims. *Estelle v Gamble*, 429 US 97, 106-108; 97 S Ct 285; 50 L Ed 2d 251 (1976); *Hein v Hein*, 337 Mich App 109, 115; 972 NW2d 337 (2021). "A party cannot simply assert an error or announce a position and then leave it to this Court to 'discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position.' " *Mitchell v Mitchell*, 296 Mich App 513, 524; 823 NW2d 153 (2012), quoting *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

DL also argues that he instructed his counsel to move for a change of venue and that his failure to do so constituted deficient performance. In a letter to counsel dated July 7, 2025, DL stated that it "would be better" if the case could be taken out of Washtenaw County and moved to Kalamazoo County. MCL 330.1456(2) provides that "[t]he subject of a petition, any interested person, or the court on its own motion may request a change of venue because of residence, convenience to parties, witnesses, or the court, or the individual's mental or physical condition." DL did not seek a change of venue for any of the listed reasons but instead claimed that "he could not get a fair trial in Washtenaw County." DL's assertions on this issue appear to be based on his unsupported claim of judicial bias, discussed later in this opinion, which was premised on DL's bare assertions that the trial judge was also involved in a conspiracy to keep him committed and his work as an "independent prosecutor" when he helped convict associates of the judge in his criminal case who poisoned people, including DL, in the Washtenaw County Jail.

As petitioner argues, the trial court was unlikely to grant a motion to change venue which would have been filed, at the earliest, two days before the scheduled hearing on July 9, 2025. Although DL lived at a Turning Leaf facility in Kalamazoo County, DL also remained under the care and supervision of Washtenaw County Community Mental Health. Under the circumstances, the trial court would have correctly denied a motion to change venue because DL did not cite a reason to change venue under MCL 330.1456(2), and he did not show that the trial court denied him due process or a fair hearing. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

DL further asserts that his counsel's performance was deficient because he did not ask for a copy of Dr. Healy's Zoom interview with DL. According to DL, a copy of the interview would have shown that DL showed no delusional symptoms during their meeting to support Dr. Healy's

testimony that respondent had schizophrenia with grandiose and paranoid delusions. DL has not shown that counsel provided ineffective assistance of counsel because he has not shown that a recording of the interview was made or that it would have been favorable to him. In any case, as discussed, Dr. Healy formulated his conclusion that DL had a mental illness and was a person needing treatment because of the interview as well as DL's medical records and discussions with DL's mental-health providers. For that reason, even if DL is correct that he did not express delusional thoughts during the interview which could have challenged Dr. Healy's conclusions, Dr. Healy knew about his history of mental illness from other sources. DL has not shown that his counsel's failure to ask for the recording deprived DL of a fair hearing and rendered the result unreliable. See *In re Londowski*, 340 Mich App at 515.

## IV. JUDICIAL BIAS

DL next claims that the trial judge was biased against him. Again, we disagree.

### A. STANDARD OF REVIEW AND LEGAL PRINCIPLES

Because DL did not raise this issue in the trial court, it is not preserved. See *People v Jackson*, 292 Mich App 583, 597; 808 NW2d 541 (2011). We review unpreserved issues in involuntary commitment proceedings under the plain-error rule. *In re MAT*, ___ Mich App at ___; slip op at 2-3. "Under this standard, a party must show that an error occurred, that it was clear or obvious, and that it caused prejudice, i.e., that the error affected the outcome of the proceedings." *Id*. at 2 (cleaned up). In criminal cases, this Court has ruled that judicial misconduct is a structural error and that a rebuttable presumption of the third prong of the plain-error rule is presumed to have been satisfied when a party shows that the trial court created an appearance of advocacy for or bias against a party. *People v Davis*, 509 Mich 52, 67, 75-76; 983 NW2d 325 (2022). We will apply those principles in this civil-commitment case.

MCR 2.003 states the circumstances in which disqualification of a judge is warranted, including if the judge was personally biased for or against a party, there was an appearance impropriety, or if the judge had personal knowledge of disputed facts in the case. MCR 2.003(C)(1)(a)-(c). Unless there is a strong appearance of impropriety that violates a party's due-process rights, a party claiming judicial bias must show actual bias or prejudice and overcome a strong presumption of judicial impartiality. *Cain v Dep't of Corrections*, 451 Mich 470, 494-497, 503; 548 NW2d 210 (1996); *Armstrong v Ypsilanti Township*, 248 Mich App 573, 597-598; 640 NW2d 321 (2001).

### B. DISCUSSION

DL asserts that the trial judge exhibited bias against him by ruling that he was a person in need of involuntary mental-health treatment under the Mental Health Code since 2021. But a party may not premise a claim of judicial bias on a judge's rulings alone without showing some actual bias like deep-seated antagonism or favoritism. *Cain*, 451 Mich at 496. DL has not shown that the trial judge exhibited a preference for Dr. Healy's testimony because she was biased against DL. Further, although DL asserts that the trial judge "often" gave undue weight to the testimony of doctors, he points to no facts, remarks, or other record evidence as a basis for this assertion. As discussed, ample evidence supported the trial court's ruling that DL had schizophrenia, he denied

the need for mental-health treatment, and that he needed continuing involuntary mental-health treatment under MCL 440.1401(1)(c). DL has not shown that this decision was based on anything other than the evidence presented.

DL also bases his claim of bias on his assertion that the trial judge knew DL "from conversations in 2015 outside the courtroom and in 2017 at a discharge hearing." According to DL, he also made a "statement to the court in May 2023" and that he sent a letter or affidavit to the Judicial Tenure Commission about the trial judge that he filed on appeal. DL maintains that the trial judge must have read his filings and this triggered a bias against him. But the filing of a complaint with the Judicial Tenure Commission is insufficient to show bias requiring judicial disqualification because it would encourage litigants or their counsels to "judge shop by filing even frivolous grievances." *People v Bero*, 168 Mich App 545, 552; 425 NW2d 138 (1988).

DL's bare assertions regarding the trial judge were also insufficient to show bias. DL stated that the trial judge previously ruled in his favor and awarded him $500,000 but inexplicably changed her view to pursue a "private vendetta" against DL to keep him incarcerated. DL made various allegations that the trial judge was paid to rule as she did by the Center for Forensic Psychiatry, that DL failed to recognize that he had a previous professional relationship with the trial judge because he had amnesia, and that organized crime was involved in his arrest and eventual commitment. DL's assertions are patently incredible and inherently implausible, and he has not shown that they resulted in any actual bias or prejudice to overcome the strong presumption of judicial impartiality. See *Cain*, 451 Mich at 494-497; *Armstrong*, 248 Mich App at 597-598.

## V. THIRTEENTH AMENDMENT

Finally, DL argues that the terms of the trial court's order violated his constitutional right to be free from slavery and involuntary servitude under the Thirteenth Amendment, US Const, Am XIII. Again, we disagree.

Because DL did not raise this issue in the trial court, it was not preserved for appellate review and our review is under the plain-error rule. See *In re MAT*, ___ Mich App at ___; slip op at 2-3.

The Thirteenth Amendment states that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." US Const, Am XIII. Respondent argues that, aside from the determination of his need for involuntary mental-health treatment, the trial court's order includes provisions that violate the Thirteenth Amendment, including forced medication; confinement without being convicted of a crime; and terms that deprive respondent of his ability to work, travel, move, or marry.

DL made the same arguments about the trial court's order for continuing involuntary mental-health treatment in *In re DL*, unpub op at 9. In that opinion, this Court observed that the Thirteenth Amendment was passed to abolish slavery and to prohibit similar forms of compulsory labor. *Id.*, citing *United States v Kozminksi*, 487 US 931, 942-943; 108 S Ct 2751; 101 L Ed 2d 788 (1988). This Court concluded that there was no basis to grant DL relief on his constitutional claim because "nothing in the trial court's order of continuing mental-health treatment requires

compulsory work or servitude that is prohibited by the Thirteenth Amendment." *In re DL*, unpub op at 9-10. Similarly, in this case, the trial court's order did not require compulsory work or service by DL, so he has not shown that the order violated the Thirteenth Amendment. Having shown no plain error, DL is not entitled to relief on this ground. See *In re MAT*, ___ Mich App at ___; slip op at 2-3.

Affirmed.

/s/ Michael J. Kelly
/s/ Sima G. Patel
/s/ Daniel S. Korobkin